Maria Dame, By Her Next Friend, *vs.* George J. Skillin.

Cumberland.    Opinion October 8, 1913.

*Assumption of risk.    Experience.    Failure of Duty.    Instructions.*
*Intelligence.    Machinery.    Negligence.    Obvious Danger.*

The plaintiff, a girl sixteen and one-half years old, was injured by having her hand caught and drawn in between the revolving cylinder rolls of a steam mangler, at which she was working in the employ of the defendant. She had worked in defendants' laundry about one year and a half, most of the time operating a steam mangle, and had operated the mangle on which she was injured about six weeks.

*Held:*

1. That laborers engaged in operating unguarded machinery assume those risks and dangers that are obvious and apparent, and readily discoverable to a person of average intelligence.

2. That an employer is not required to inform his servant of those risks and dangers incident to the employment which the servant already knows, or which a person of the servant's experience and capacity, by the exercise of ordinary care and attention, might have known.

3. The extent of the employer's obligation to give instruction is to be determined with reference to the plaintiff's duty to exercise her senses and faculties in order to discover and comprehend the dangers incident to her work.

On motion by defendant.    Motion sustained.

This is an action on the case to recover damages for an injury occasioned by the negligence of the defendant in not sufficiently instructing her as to the danger incident to operating the steam mangle on which she was working at the time of the accident. The plaintiff, who was a girl sixteen and a half years old, had worked in the defendant's laundry for about one and one-half years, most of the time operating a steam mangle, and for six weeks prior to the injury operating the steam mangle on which she was working at the time of the accident. The plaintiff was injured by having her right hand drawn in between the steam heated cylinder and the large roll above it. The plea was the general issue.

The jury returned a verdict for the plaintiff for $1500, and the defendant filed a motion for a new trial.

The case is stated in the opinion.

*Connellan & Connellan,* for plaintiff.

*Wilson & Bodge,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, PHILBROOK. JJ.

KING, J. This is an action to recover damages for injuries received by the plaintiff while in the employ of the defendant and engaged in operating a steam flat-piece ironer or mangle. The action is based on the alleged negligence of the defendant.

The plaintiff was sixteen and a half years old at the time of the accident. She had worked in defendant's laundry about a year and a half, most of the time operating a steam mangle, and she had operated the mangle on which she was injured about six weeks—all the time after it was put in the laundry up to the 24th day of August, 1911, when she was injured.

This mangle is an approved type of flat-piece ironer commonly used in laundries. We may not be able to describe it well without the aid of the photograph put in evidence. It consists of a large steam-heated cylinder about eight feet long, placed horizontally, over which are two or more heavy rollers of the same length covered with canvass. The cylinder and rollers revolve in opposite directions, and are so close together that sheets, pillow slips, towels and other articles to be ironed are drawn in between the cylinder and rollers as they revolve and are ironed as they pass through. A horizontal shelf or feed plate, so called, about ten inches wide, is placed lengthwise of, and as close to the surface of the cylinder as practicable and not be in contact with it, the line of its plane striking the cylinder some distance below its top. In front of the feed plate is the feed roll which revolves in the same direction with the cylinder. Ten ribbons, or strips of fabric, called "feed-strips" or "apron-strips," pass up around the feed roller and across the surface of the feed plate and in between the cylinder and rollers. These feed-strips move as the feed roll and cylinder move, and pass around and around through the machine. The article to be ironed is placed smooth on

the apron-strips and as these move it is carried along and in between the cylinder and rollers. There is also a guard roll extending the length of the machine and placed in front of the point of contact of the cylinder and upper roller. This guard roll appears to be 4 or 5 inches in diameter, and is covered with canvass like the larger rolls. It rests at either end and revolves in bearings on swinging arms which permit it to be lifted up bodily around to the top of the first roll, if necessary, keeping always its relative distance from the surface of that roll. This guard roll is so hung that, unless lifted by some force, it touches the apron strips, and its top is about an inch and a half from the surface of the larger roll above it—it being somewhat under the larger roll, so that a perpendicular line dropped down by the front side of the larger roll would strike near the center of the guard roll. The guard roll revolves downward and inward, and is turned by the friction of the apron-strips passing under it, and also by the force and effect of several (seventeen) twine strings placed at equal distances apart and drawn tight down over the upper rolls and under the guard roll. As the larger rolls revolve the strings move, turning the guard roll as they pass under it. The way in which the guard roll is hung, on the movable arms, permits some upward movement of it should articles passing under it be or become of uneven thickness. Its purpose is to prevent articles from going into the machine crooked and uneven, for unless the articles are smooth and even when they reach this guard roll they will not pass under it on the apron-strips, but bunch up in front of it, and the operator can safely take them away and smooth them out. If the guard roll does not revolve then the articles, though smooth and even, will not pass under it, but bunch up in front of it. It appears from the evidence that if a considerable number of the strings are broken (and they frequently break being of ordinary twine) the guard roll will stop revolving. The distance from the center of the top of the guard roll to the steam-heated cylinder beyond is "between five and five and a half inches."

The plaintiff was injured by her right hand going in over the top of the guard roll and being drawn in between the steam-heated cylinder and the large roll above it. It appears that at the time of the accident so many of the strings were broken that the guard roll bothered and did not revolve constantly. The plaintiff thus stated

how the accident occurred: "Well, I took my pillow slip and I put it here and it went as far as that little roll right here, and it would not go any further because it bunched all up, and I pulled it back and laid it again, and it went as far as that little roll, and when it did go as far as that, I put my hand on that little roll here, just my fingers, and pulled it toward me so the pillow slip would go in. That is just how I done it that night." (Indicating on photograph.)

It seems evident that the plaintiff put her finger so far into the little space between the top of the guard roll and the larger roll above it that her hand was drawn in between that roll and the steam-heated cylinder.

The chief claim in her behalf at the trial was that she was not sufficiently instructed as to the danger incident to operating this machine, or, to be more specific, of the danger in turning the guard roll with her hands.

It is alleged in her writ "that she was entirely inexperienced in laundry work and in the operation and handling of any kind of machinery." That allegation is not sustained by the evidence. On the other hand she had worked in this laundry for about a year and a half, operating a steam mangle most of the time, and had operated this particular mangle for six weeks. It is also alleged that she was of immature intelligence. But no evidence was offered to support that allegation, and we do not think such a conclusion is justified by her own testimony, for that shows her to have been a girl of at least average intelligence for one of her age and circumstances. Indeed it was she who operated the old mangle for about a year and a half, and who was put in charge of the new one when it was installed; and when two girls worked at the mangle it was the plaintiff who had the right hand side of the machine and operated the lever in starting and stopping it. That does not indicate that she was regarded by her employer, or those who worked with her, as a person of immature intelligence.

If it did not so appear in evidence, it would still be reasonable to infer that the plaintiff, both from observation and actual experience in operating a mangle for a year and a half, must have obtained knowledge of the method of its operation, and must have had full opportunity to ascertain and appreciate any risks incident to the use of such a machine. But it does so appear in evidence. In her

testimony the plaintiff discloses that she understood clearly how the machine operated in doing its work. She knew that the cylinder within was heated, and that there was a similar heated cylinder in the old mangle; that it revolved in contact with the large rolls over it, and that the guard roll was placed in front of the point of contact of the cylinder and rolls for protection, to prevent articles from being drawn in between the cylinder and rolls when they ought not to go in there.

She testified in substance and effect that the heated cylinder inside was revolving so near the guard roll that as soon as an article passed under the guard roll it was drawn between the cylinder and the big revolving roll above it, and that the top of the guard roll was "right near" the big roll—and the big roll was revolving all the time in plain sight. Seeing that big roll revolving inward over and so near the top of the guard roll, it would be obvious to any person of average intelligence, and plainly was so understood by the plaintiff, that if anything came in contact with the surface of the big roll as it revolved inward over the top of the guard roll it would propably be drawn into the machine. That she did so understand is shown in her explanation of how her hand was caught. "I put it right on the little roll. The big roll is so near that little roll, the tops of my fingers got caught on the big roll and it drew my hand in."

It is an established doctrine, repeatedly examined and carefully considered in the recent decisions of this court, that laborers engaged in operating unguarded machinery assume those risks and dangers that are obvious and apparent, and readily discernible to a person of average intelligence. And it is likewise a well settled doctrine that an employer is not required to inform his servant of those risks and dangers incident to the employment which the servant already knows, or which a person of the servant's experience and capacity by the exercise of ordinary care and attention might have known. In *Wiley* v. *Batchelder,* 105 Maine, 536, it was well said: "The extent of the obligation resting upon the employer to give instruction must be determined with reference to the reciprocal duty resting upon the plaintiff to exercise the senses and faculties with which she was endowed in order to discover and comprehend these dangers for herself."

Applying these doctrines to this case, what is the necessary conclusion? The danger which the plaintiff did not avoid, and which she contends the defendant should have instructed her to avoid, was that incident to putting her hand upon or over the top of the guard roll so that it would come in contact with the revolving heavy roll above it and be thereby drawn into the machine. But that was an obvious and apparent danger. It was entirely open and readily discernible to even casual observation. For six weeks the plaintiff had been operating that machine, and looking at that heavy roll revolving inward "right near" the top of the guard roll—"so near" that when she put the tips of her fingers on the little roll, as she says, "it drew my hand in." The conclusion is inevitable that the plaintiff knew, or is chargeable with knowledge, that if she put her hand over the top of the guard roll and in contact with that heavy roll revolving inward her hand would probably be drawn into the machine, and that the only way to avoid that risk was to keep her fingers and hands away from that place. Having knowledge of the risk and how to avoid it, she needed no instruction from the defendant concerning it. He was not bound to inform her of what she already knew.

But there was evidence that she was instructed as to the operation of this machine, and was warned against this particular risk. She admits that Mr. Woodrow, who installed this machine, gave her some instructions as to operating it, but denies that he warned her not to put her hands on the guard roll to turn it when the big roll was revolving. Mr. Woodrow testified that he gave instructions how to operate the machine to the girls in the laundry, and particularly to the plaintiff, because the superintendent "pointed her out and said she was the one to run this machine, and I was to give her instructions," and that he specially warned her never to put her hands on the guard roll to turn it when the machine was going, "that if they got caught in there, it would surely spoil their hand."

Bessie May Miller worked more or less on this mangle with the plaintiff and was working with her at the time of the accident. She testified that the guard roll stopped quite a lot during that evening and they started it with their hands, but "I told her I would not start is any more" . . . "Q. Did you have any fear of getting injured? A. Well, I knew it was a dangerous machine if you put

your hands too close starting that roll. Q. Did Maria continue to start the roll? A. Yes, sir." This testimony, which was not contradicted, shows that the risk of being injured by putting her hands on the guard roll to turn it was clearly presented to her mind just before the accident.

Her physician testified that about a week after her injury, in answer to his inquiry how the accident happened "She said she was going to put the cloth in and the machine did not work right, and she said, 'Darn the thing, I will make it go' and gave a shove and her hand caught." She denied that she made that statement.

Upon consideration of all the evidence, examined in the light most favorable to the plaintiff's contentions it is the opinion of the court that there was no failure of duty on the part of the defendant in respect to warning the plaintiff of the risk of being injured if she put her hands on the top of the guard roll, so near the surface of the large revolving roll above it. That risk was obvious and apparent to her, and she must have known and appreciated it. In putting her hand there she assumed the risk of such an injury as resulted to her.

Moreover, the conclusion seems irresistible, that the unfortunate accident to the plaintiff was the result of a failure on her own part to exercise ordinary care. She may have been too impatient, and she was without doubt too venturesome.

*Motion sustained.*